UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆

**CORNERSTONE REALTY GROUP, INC. and
CORNERSTONE REALTY GROUP, LLC,**

                                **Plaintiffs,**


               **-v-**                                    **1:07-CV-167**


**FRED BAUM, KONSTANIN LEVIEV, and THE
LEVIEV DEVELOPMENT, LLC,**

                                **Defendants.**

◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆◆

APPEARANCES:
Gould & Berg, LLP
Jane Bilus Gould, Esq., of counsel
222 Bloomingdale Road
White Plains, New York 10605
and
Minard Law, PLLC
Jason D. Minard, Esq., of counsel
P.O. Box 817
Highland, NY 12528
Attorneys for Plaintiffs

Office of Dennis B. Schlenker
Dennis B. Schlenker, Esq.
174 Washington Avenue
Albany, New York 12210
Attorney for Defendant Fred Baum

Gleason, Dunn, Walsh & O'Shea
Mark T. Walsh, Esq., of counsel
40 Beaver Street
Albany, New York 12207
Attorneys for Defendants Konstanin Leviev and
The Leviev Development, LLC

**Hon. Norman A. Mordue, Chief U.S. District Judge:**


                **MEMORANDUM-DECISION AND ORDER**


                        **INTRODUCTION**

In this action, plaintiffs Cornerstone Realty Group, Inc. and Cornerstone Realty Group, LLC (together, "Cornerstone")[1] claim defendants wrongfully caused Cornerstone to lose its contractual option to purchase and develop over 400 lots owned by Greene County ("County"). On March 24, 2008, this Court issued a Memorandum-Decision and Order (Dkt. No. 25) granting defendants' motion to dismiss the complaint, with leave to replead certain causes of action. On April 14, 2008, plaintiffs filed and served an amended complaint (Dkt. No. 26). After lengthy discovery, the parties stipulated (Dkt. No. 64) to dismiss with prejudice the second, fourth, fifth, and sixth claims in the amended complaint, leaving only the first cause of action for breach of contract against Leviev LLC and the third cause of action for "fraud/fraudulent scheme" against all three defendants.

Defendant Fred Baum ("Baum") moves (Dkt. No. 65) for summary judgment dismissing the third cause of action. Defendants Konstantin Leviev ("K. Leviev") and The Leviev Development, LLC ("Leviev LLC") move (Dkt. No. 69) for summary judgment dismissing the first and third causes of action. As set forth below, the Court grants both motions and dismisses the action in its entirety.

**BACKGROUND**

Briefly, the undisputed facts are as follows. Sleepy Hollow Lake ("Sleepy Hollow") is a 2200-acre subdivision community in Greene County, managed by the Association of Property Owners of Sleepy Hollow Lake, Inc. ("APO"). By early 2002, as a result of tax foreclosures, the

---

[1] On October 29, 2003, Cornerstone Realty Group, Inc. assigned its interests to Cornerstone Realty Group, LLC. Except where necessary to distinguish between the two, the Court refers to both as "Cornerstone." In the "Discussion" section of this Memorandum-Decision and Order, the Court addresses the legal issue arising from this assignment.

County held title to over 400 parcels in Sleepy Hollow.  On July 19, 2002, the County and APO entered into a Development Rights Agreement ("County/APO-DRA"), which gave APO "the exclusive option to purchase, develop, market and sell the County owned properties in Sleepy Hollow[.]"  The agreement stated that the County "specifically desires by this contract to facilitate the transfer of County-owned lots to private third party individuals who agree to build homes on the lots."  The County/APO-DRA acknowledged that APO had separately contracted with Cornerstone to develop and market certain of the properties.  The County/APO-DRA provided that it would "terminate automatically and immediately upon Cornerstone's failure to build 20 homes to completion by December 31, 2003."

On the same date, July 19, 2002, APO and Cornerstone entered into a separate Development Rights Agreement ("APO/Cornerstone-DRA").  This agreement provided Cornerstone with "the exclusive option to purchase, develop, market and sell" certain identified County-owned properties, a total of about 440 lots.  The agreement was for a term of two years, to be extended for an additional two years "if, within eighteen (18) months of the effective date of this Agreement, construction is complete of at least twenty (20) single family homes."

In or about December 2002, Roy G. Jacobs ("Jacobs") on behalf of Cornerstone[2] began negotiating an agreement with defendant Fred Baum.  Eventually Baum proposed that Cornerstone enter into a development agreement with Leviev LLC as developer, with Baum acting as project manager.  On May 30, 2003, Cornerstone and Leviev LLC entered into the Purchase Agreement ("Cornerstone/Leviev Purchase Agreement") that is the subject of the

---

[2] Jacobs was President of Cornerstone Realty Group, Inc. and a majority member of Cornerstone Realty Group, LLC.

present action.  The agreement provided that Leviev LLC "shall acquire all lots for construction and use good faith and diligent efforts to complete 20 single-family residences, and convey same to third-party purchasers on or before December 31, 2003."  The agreement acknowledged that it was "also subject to the terms and provisions" of the County/APO-DRA and the APO/Cornerstone-DRA, and Leviev LLC agreed to comply with the terms of those agreements.

Leviev LLC did not complete 20 homes by December 31, 2003.  In July 2004 the County passed Resolution No. 291-04 providing that it would enter into a new agreement with APO on the condition that there would be no third-party beneficiary to the contract.  On November 17, 2004, the County passed Resolution No. 440-04 rescinding Resolution No. 291-04 and stating that "the County no longer wishes to offer to contract with the Homeowner's Association under the terms and conditions set forth in that Resolution."  On February 16, 2005, the County and Leviev LLC signed a contract for Leviev LLC to purchase all the County-owned lots for $1.5 million.

In January 2005, Cornerstone commenced a CPLR Article 78 proceeding against the County and APO.  *Cornerstone Realty Group, LLC v. County of Greene*, 859 N.Y.S.2d 893 (Table), 2005 WL 6075236 (N.Y. Sup. June 6, 2005), *aff'd* 814 N.Y.S.2d 343 (3d Dep't 2006). Cornerstone sought a ruling that the County's resolution be deemed of no force and effect and a declaration that the County/APO-DRA was "valid and binding on the parties thereto."  The Third Department found that the County/APO-DRA was "an option contract requiring strict compliance with its terms" and affirmed Supreme Court's declaration that the County/APO-DRA had ended by its own terms when the December 2003 deadline passed without the completion of 20 homes.

The amended complaint (Dkt. No. 26) claims that when Leviev LLC agreed to build the 20 homes "it already had a preconceived and undisclosed intention of not building the 20 homes in anticipation of Cornerstone Inc.'s contract with the APO expiring, only for Leviev Development to take Cornerstone Inc.'s place as the developer of Sleepy Hollow Lake." It further alleges that Leviev LLC failed to make good faith and diligent efforts to construct or convey homes pursuant to the Cornerstone/Leviev Purchase Agreement, that it breached that agreement, and that the breach was part of a calculated scheme on the part of Baum, K. Leviev and Leviev LLC to become the sole developers of Sleepy Hollow.

## THE CONTRACTS

**County/APO-DRA**

The July 19, 2002 Development Rights Agreement entered into by Greene County and APO ("County/APO-DRA") gave APO "the exclusive option to purchase, develop, market and sell the County owned properties in Sleepy Hollow[.]" The agreement stated that the County "specifically desires by this contract to facilitate the transfer of County-owned lots to private third party individuals who agree to build homes on the lots." It acknowledged that APO had separately contracted with Cornerstone to develop and market certain of the properties. The County/APO-DRA agreement provided that APO would pay the County $125 for each lot during the first two years of the contract, $225 in the third year, $325 in the fourth year, $425 in the fifth year, and $525 in the sixth year.

The term of the County/APO-DRA agreement was as follows:

> 4. This agreement shall terminate automatically and immediately upon the earliest of:
>> (a) Six (6) years from the effective date of this agreement, or
>> (b) The effective date of the termination of Cornerstone's contract

with the APO, or

(c) Upon the mutual written consent of the parties to this agreement[, or]

(d) Cornerstone's failure to build 20 homes to completion in Sleepy Hollow by December 2003.

The agreement further provided: "Upon termination of this agreement, for any reason, all rights conveyed under this agreement shall revert to the County."

**APO/Cornerstone-DRA**

On the same date, July 19, 2002, APO and Cornerstone entered into a separate Development Rights Agreement ("APO/Cornerstone-DRA"). The agreement provided:

1. Exclusive Development Rights.
   a. The APO hereby conveys to Cornerstone the exclusive option to purchase, develop, market, and sell the certain properties identified within the Pilot Redevelopment Plan ("PRP")....
   b. The APO hereby conveys the exclusive option rights for the term of this Agreement. Upon termination of this Agreement, for any reason, all rights shall revert to the APO.

***

4. Sale of Property
   a. The APO shall enter into an agreement with the County for the purchase and sale of the real estate parcels within the PRP.
   b. Upon request from Cornerstone, the APO shall buy from the County and then sell Cornerstone the listed parcels among the properties in the PRP.
   c. The price per lot, to be paid by Cornerstone to APO, shall be as follows:
      i. $375.00 per lot for the first twenty (20) lots selected by Cornerstone;
      ii. $500.00 per lot for the next ten (10) lots selected by Cornerstone;
      iii. $750.00 for the next twenty (20) lots selected by Cornerstone; and,
      iv. $1,000.00 for the next fifty (50) lots selected by Cornerstone.
   d. The APO, upon receipt of monies from Cornerstone for the purchase of parcels and the exercise by the APO of its option to purchase parcels from the County, shall pay the County for said parcels in accordance with the agreement between the County and the

-6-

APO.

Among other obligations, Cornerstone agreed to construct at least three model homes at locations to be agreed upon between the parties; pay all dues and fees of APO upon taking title to each lot; work diligently to obtain building permits from appropriate municipalities; and pay for and provide to APO a survey map and deed description of all lots sold by Cornerstone.  Cornerstone agreed that it "shall not sell any lots, consolidated or unconsolidated, without contracts to construct single-family homes on said lots."

The APO/Cornerstone-DRA further provided:

> 8. Term.
> a. This Agreement shall have an effective date of July __, 2002.
> b. This agreement shall terminate automatically and immediately upon the earliest of:
>> i. Two (2) years from the effective date of this Agreement as stated in Section 8(a); or
>> ii. The effective date of the termination and removal of Cornerstone pursuant to Section 7 of this Agreement [which lists numerous defaults or breaches not in issue here];
>> iii. Upon mutual written consent of the parties to this Agreement.
> c. This Agreement shall be extended for an additional two (2) years from the effective date of this Agreement if, within eighteen (18) months of the effective date of this Agreement, construction is complete of at least twenty (20) single family homes on lots within the PRP. This Agreement shall be extended further for an additional two (2) years if, upon the fourth anniversary of the effective date of this Agreement, construction is complete on at least forty-five (45) homes on lots sold by Cornerstone under this Agreement.
> d. The term of the County/APO Agreement shall run for six years.  Within the first twenty-four months of the County/APO Agreement the APO shall develop a Master Redevelopment Plan ("MRP"). Upon acceptance of the MRP by the County and local municipalities, the APO shall review the MRP with Cornerstone. Upon agreement of Cornerstone and APO in writing, the APO will enter into an agreement with Cornerstone for the remaining term of the County/APO Agreement.

**Cornerstone/Leviev Purchase Agreement**

In or about December 2002, Roy G. Jacobs on behalf of Cornerstone began negotiating a

Purchase Agreement with defendant Fred Baum on behalf of Four Musketeer, LLC, ("Musketeer") whereby Cornerstone would sell and Musketeer would purchase certain lots identified in the APO/Cornerstone-DRA and develop them in accordance with the APO/Cornerstone-DRA.  According to the amended complaint, Musketeer is "a fictitious limited liability company that has never been authorized to do business in New York," and Baum fraudulently and deceitfully represented that Musketeer had the capacity and financial resources to develop the Sleepy Hollow subdivision in accordance with the APO/Cornerstone-DRA.  No agreement was executed.

Baum then proposed that Cornerstone work with K. Leviev and Leviev LLC.  The amended complaint alleges that Baum represented that K. Leviev and Leviev LLC were "experienced developers who intended to develop the Sleepy Hollow Lake subdivision in accordance with" the APO/Cornerstone-DRA.  The amended complaint adds that "Baum represented to Jacobs of Cornerstone, Inc. that he [Baum] would be the Sleepy Hollow Lake subdivision development Project manager" for Leviev LLC.

On May 30, 2003, Cornerstone and Leviev LLC entered into the Purchase Agreement ("Cornerstone/Leviev Purchase Agreement") that is the subject of the present action.  The agreement provided:

> WHEREAS, Cornerstone is a party to a Development Rights Agreement with the ... [APO] wherein Cornerstone was granted the exclusive option and rights to purchase, develop, market and sell certain properties identified in said Agreement, and
>
> WHEREAS, Cornerstone wishes to sell to LEVIEV and LEVIEV wish[es] to purchase certain of the lots identified in said Development Rights Agreement in accordance with the terms and provisions of this Purchase Agreement,
>
> NOW, THEREFORE in consideration of the mutual covenants, consideration

-8-

and promises herein contained, the parties agree as follows:

I. Option to purchase Lots:

1.  During the term of this Agreement, LEVIEV is hereby granted the option to purchase and acquire any of the lots set forth on Schedule "A" annexed hereto during the term of this Agreement for the consideration herein contained and subject to the terms and provisions of this Agreement.  This option, however, is subject to the reservation and right of Cornerstone to withdraw any lot in accordance with paragraph "2" hereof.

2. The option granted to LEVIEV pursuant to this Agreement is subject to Cornerstone reserving the right to withdraw any of the lots from this Option Agreement and to develop, construct and/or sell said lot to a third party purchaser.  Cornerstone shall not withdraw any more than ten (10) lots during the first year or any more than six (6) lots for any succeeding year thereafter during the term of this Agreement....

***

4. Cornerstone shall be prohibited from offering to sell or selling any lots other than to LEVIEV or by exercising its withdrawal rights above.

***

II. Exercise of Option to Purchase Lots:

1. Provided LEVIEV is not in default under the terms and provisions of this Agreement, then to exercise its option to purchase any of the lots set forth herein, LEVIEV must:

    (a) Notify Cornerstone, in writing, of its intent to exercise the option and purchase the lot designated in said notice...; and

    (b) To exercise the option and to acquire a lot, LEVIEV must be under contract with a third party purchaser or represent in contractually binding form [that] it will complete construction of a single family residence on the lot (subject, however, to the maximum 15 lots "not under contract" as set forth in paragraph III(4) hereof.  With the notice herein contained (except for those lots "not under contract" per Paragraph III(4) hereof), LEVIEV must provide Cornerstone with a fully executed copy of the Purchase Agreement between LEVIEV and the third party purchaser for the construction of a single family home.  Said Contract shall provide for the construction of a single family residence and the completion and occupancy of same within six (6) months of date of said notification.

    ***

    (e) Contemporaneously with the conveyance of the lot (delivery of the deed) by CORNERSTONE to LEVIEV, LEVIEV shall pay to Cornerstone the sum of $10,000 per lot for the first twenty (20) lots transferred; the sum of $12,500 per lot for the next forth (40) lots transferred; the sum of $16,000 per lot for the next forty (40) lots transferred; and $18,500.00 per lot for each lot transferred thereafter....

The agreed-upon consideration was set forth as follows:

III.  Consideration/Purchase Price

1. In consideration of Cornerstone granting the option to LEVIEV to purchase the lots as herein contained, LEVIEV shall pay to Cornerstone the sum of $200,000.00.  The $200,000.00 shall be paid as follows: simultaneously with the execution of the Agreement, the sum of $25,000.00 to be held in escrow by Rizzo & Kelley until delivery of the Deeds to the 20 lots (3 model home lots and 17 lots...) and LEVIEV obtaining, at its sole cost and expense, insurable title for said lots from Old Republic National Title Insurance Company.... Simultaneously with Cornerstone delivering to LEVIEV the Deeds to the 20 lots and LEVIEV obtaining insurable title aforesaid, the $25,000.00 escrow payment shall be released by Rizzo & Kelley to Cornerstone and LEVIEV shall pay to Cornerstone the sum of $175,000.00. With said $200,000.00 option payment, LEVIEV shall receive deeds for the first twenty (20) lots....
***
4. Simultaneously with the $200,000 payment LEVIEV hereby exercises its option to purchase the twenty (20) lots set forth on Schedule "B" annexed hereto for the exercise price of $10,000 per lot.... Moreover, during the term of this Agreement and subject to consent of the APO and the County, LEVIEV can also acquire further lots "not yet under contract with a third party purchaser, for construction of a single family home ("not under contract") with the payment of the lot acquisition fee per lot to Cornerstone at the time of the delivery of the deed to LEVIEV, provided, however, that at no time shall LEVIEV have more than 15 lots at one time "not under contract".  It being the intent that LEVIEV may maintain an inventory of lots "not under contract" of no more than 15 lots at any one time.  It is agreed, however, that Cornerstone's obligation to deliver and convey lots "not under contract" is subject and conditioned upon the consent and approval of the APO and the County of Greene.

The Cornerstone/Leviev Purchase Agreement required Leviev LLC, *inter alia*, to obtain all necessary municipal approvals including a building permit; provide surveys and a survey description at its own expense to Cornerstone, APO, the County, and prospective purchasers; pay all transfer fees and closing costs; pay the annual tax escrow sum of $25,000 to APO; and reimburse Cornerstone for taxes and expenses already paid.  Both Baum and  K. Leviev personally guaranteed the $25,000 annual tax escrow payment.

-10-

The Cornerstone/Leviev Purchase Agreement further provided:

IV. Term:

1. Provided LEVIEV is not in default under the terms and provisions of this Agreement, the term of this Agreement shall run through and including July 19, 2004, unless Cornerstone's Agreement with APO is extended pursuant to paragraph "8" thereof [*i.e.*, the provision that the Cornerstone/Leviev Purchase Agreement would be extended for an additional two years if construction was complete on at least 20 homes within 18 months] wherein this Agreement shall also be extended for a commensurate time period. Cornerstone agrees to use its best efforts to extend the APO agreement. After the closing, Cornerstone shall request APO to send a letter to the County requesting an extension of time ... from December 31, 2003 until July 30, 2004 to complete the 20 homes required by paragraph "4" of the County of Greene/APO Agreement. The failure of the County to grant said request, however, shall not terminate or nullify any of the conditions, terms, provisions, ... or covenants of this Agreement. Should LEVIEV default in the terms and provisions of this Agreement, then in that event, on five (5) days written notice to cure, Cornerstone may cancel this Agreement and LEVIEV shall forfeit any payments herein made and shall have no further rights under this Agreement and its option to purchase any of the lots herein contained shall automatically terminate.

V. Acquisition of Lots, Subject To and Insurable Title:

\*\*\*

3. The conveyance of title to ... LEVIEV shall be subject to the following:

   \*\*\*

   (j) This Agreement and the transfer and conveyance is also subject to the terms and provisions of the Development Rights Agreement dated July 19, 2002 between Cornerstone and APO. LEVIEV agrees to fully comply with the terms and provisions of said Development Rights Agreement and also agrees to pay, during the term of this Agreement, the $25,000.00 annual tax escrow payment as set forth in ... the Development Rights Agreement, pay all transfer fees, closing costs, transfer tax/revenue stamps and expenses associated with the conveyance and acquisition of the lots herein contained; pay all dues, fees and expenses associated with said lots and to otherwise comply with all the other terms, provisions, conditions and duties of Cornerstone, as contained in said Development Rights Agreement;

   (k) This Agreement and the acquisition of the lots herein contained is also subject to the terms and provisions of the Development Rights Agreement between APO and the County of Greene and LEVIEV and Cornerstone agree to fully comply with same[.]

   \*\*\*

   (t) Cornerstone represents that it has previously provided full and

-11-

> accurate copies of the agreements between APO and Greene County,
> APO and Cornerstone and the Pilot Development Plan to LEVIEV.

(Emphasis added.)  Article VI, paragraph 1 of the Cornerstone/Leviev Purchase Agreement

provided:

> Except as contained in paragraph "4" of Article III hereof [*i.e.*, the provision
> permitting Leviev to build up to 15 lots "not under contract"], it is expressly
> understood and agreed between the parties that LEVIEV shall have no right
> to exercise the option of purchasing any of the lots as contained herein, unless
> LEVIEV is under contract with a third party purchaser... to construct a single
> family residence on the subject lot to be completed and the purchaser to
> undertake occupancy of said single family residence within six (6) months of
> the date of the exercise of said option.  It being the intent, understanding and
> agreement between the parties hereto that no lot shall be conveyed unless a
> single family residence is to be constructed on same and said lot will be
> offered for the sale and construction of a completed single family residence
> on said lot to a third party purchaser.  LEVIEV shall acquire all lots for
> construction and use good faith and diligent efforts to complete twenty (20)
> single family residences, and convey same to third party purchasers on or
> before December 31, 2003.  LEVIEV acknowledges that Cornerstone
> Development's agreement with APO and the Development's rights agreement
> between APO and the County of Greene require 20 homes to be completed by
> December 31, 2003. Should APO or the County terminate Cornerstone
> Development's agreement by virtue of the failure of LEVIEV to complete and
> convey 20 homes by December 31, 2003, then Cornerstone may also
> terminate this agreement and LEVIEV shall forfeit all payments made and
> rights and/or interest hereunder without recourse or relief against Cornerstone
> or Roy Jacobs.  Should LEVIEV fail to comply with said construction,
> performance, criteria, and standards and should either the county or APO hold
> Cornerstone in default of its Agreement by virtue of the same, then in that
> event, Cornerstone may, on ten (10) days written notice to LEVIEV, cancel
> this Agreement and LEVIEV shall forfeit all payment made hereunder and
> shall have no further rights, interests into this Agreement or any of the lots,
> as herein contained and delineated.

(Emphasis added.)

The Cornerstone/Leviev Purchase Agreement set forth a default provision as follows:

> XIII. Default:
> 1. Should either party default in the terms and provisions of this Agreement,
> default and/or fail to comply with any of the terms, provisions and agreements

-12-

of the Development Rights Agreement between Cornerstone and APO, the Development Rights Agreement between APO and County of Greene ... then in that event, on ten (10) days written notice to cure, the non-defaulting party may cancel this Agreement and Leviev will forfeit any and all rights, interest and/or payments herein contained and this Agreement shall automatically terminate without any further action on either party.

2. Should APO and/or the County of Greene cancel the Development Agreements between the County of Greene and the APO, and/or the APO and Cornerstone, or should same terminate, then in that event, this Agreement shall automatically terminate and there shall be no further force and effect upon either party hereto.

### AMENDED COMPLAINT

The parties stipulated to dismiss all causes of action in the amended complaint (Dkt. No. 26) except the first cause of action against Leviev LLC for breach of contract and the third cause of action against K. Leviev, Leviev LLC and Baum for fraud.

**First cause of action against Leviev LLC for breach of contract**

The first cause of action, for breach of contract, is asserted only against Leviev LLC. In alleging that Leviev LLC breached the contract, the amended complaint claims as follows:

> 60. LEVIEV DEVELOPMENT breached the May 30, 2003 Purchase Agreement between LEVIEV DEVELOPMENT and CORNERSTONE INC in the following ways:
>> 1. LEVIEV DEVELOPMENT failed to complete 20 homes by December 31, 2003, as required by Section VI, paragraph "1" of the Agreement.
>> ***

The amended complaint also claims that Leviev LLC failed to perform numerous other obligations under the Cornerstone/Leviev Purchase Agreement, including the following: completing three models within 120 days of the agreement; selecting at least six models homes to be constructed and submitting plans and specifications for same to Cornerstone and APO; spending at least $8,000 per month on advertising and marketing; completing the website for

development and construction of the project; entering into an agreement with a modular manufacturer to construct and supply at least six model homes; and obtaining a general liability insurance and builder's risk insurance policy designating Cornerstone and Jacobs as additional insureds.

In the amended complaint, Cornerstone claims it was injured by Leviev LLC's breach of contract as follows:

> 61. As a result of LEVIEV DEVELOPMENT'S numerous bad faith breaches of the May 30, 2003 Purchase Agreement, CORNERSTONE INC'S contract and third party rights under the Agreement between the APO and Greene County automatically terminated, and CORNERSTONE INC forfeited its interest in developing Sleepy Hollow Lake pursuant to its Development Rights Agreement with the APO.

> 62. By virtue of the foregoing, CORNERSTONE INC'S and CORNERSTONE LLC'S current and future business prospects, opportunities and financial success have been compromised, diminished and prejudiced. CORNERSTONE INC and CORNERSTONE LLC have been damaged and demand judgment against LEVIEV DEVELOPMENT in an amount to be determined at or before trial, but in no event less than one million dollars ($1,000,000.00), with interest at the legal rate with the costs, disbursements and legal fees incurred in this action.

**Third cause of action against all defendants for "fraud/fraudulent scheme"**

The third cause of action against Baum, K. Leviev and Leviev LLC alleges that in April 2003, Baum proposed that Cornerstone work with K. Leviev and Leviev LLC "to effectuate the spirit and purpose of the failed deal" between Cornerstone Inc. and Musketeer; that during teleconferences and meetings in April and May 2003, defendants fraudulently misrepresented to Cornerstone that K. Leviev and Leviev LLC were experienced developers who intended to and had the financial resources to develop the Sleepy Hollow Lake subdivision in accordance with the APO/Cornerstone-DRA; that defendants fraudulently and deceitfully represented to Cornerstone

-14-

that Leviev LLC intended to build 20 homes and convey them to third-party purchasers on or before December 31, 2003 in accordance with the APO/Cornerstone-DRA; that when they made the fraudulent representations defendants "had a preconceived and undisclosed intention to not develop the Sleepy Hollow Lake subdivision in accordance with" the APO/Cornerstone-DRA and further "had a preconceived and undisclosed intention to not build twenty (20) homes, and convey same to third-party purchasers on or before December 31, 2003"; that defendants knew the representations were false; that Cornerstone relied on the representations to its detriment by not pursuing other developers to develop Sleepy Hollow Lake; and that in reliance on such representations Cornerstone entered into the Cornerstone/Leviev Purchase Agreement on May 30, 2003.

The third cause of action further alleges that when Leviev LLC entered into the Cornerstone/Leviev Purchase Agreement, it "already had a preconceived and undisclosed intention of not building the 20 homes in anticipation of Cornerstone Inc.'s contract with the APO expiring, only for Leviev Development to take Cornerstone Inc.'s place as the developer of Sleepy Hollow Lake"; that in furtherance of their fraudulent scheme, defendants "continually failed to make good faith and diligent efforts to construct even one home" and "purposely and knowingly in bad faith delayed the building of twenty (20) homes in anticipation of Cornerstone Inc.'s Development Rights Agreement with the APO terminating automatically"; that "Leviev LLC purposefully breached its Agreement with Cornerstone Inc., knowing that its breach would result in the automatic termination of Cornerstone Inc.'s contract with the APO"; that Leviev LLC's breach of contract "was part of a larger plan or fraudulent and calculated scheme so that K. Leviev and Leviev Development could contract with the County and/or the APO to unilaterally

-15-

develop the Sleepy Hollow Lake subdivision"; and "that K. Leviev and Leviev Development did

enter into a contract with the County and/or the APO to develop the Sleepy Hollow Lake

subdivision."  Cornerstone claims that as a result of the fraudulent scheme, Cornerstone "has lost

its credibility with both the Greene County Legislature and members of the APO" and has

suffered damages of at least $1 million.  Cornerstone also seeks punitive damages of $10 million.

## THE MOTIONS

Baum moves (Dkt. No. 65) for summary judgment dismissing the third cause of action

against him.  K. Leviev and Leviev LLC move (Dkt. No. 69) for summary judgment dismissing

the first and third causes of action.  As set forth below, the motions are granted and the action

dismissed.

## DISCUSSION

**Standard on summary judgment**

Summary judgment is appropriate only when there is no genuine issue with regard to any

material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(c). When deciding a summary judgment motion, a court must construe all the evidence in the

light most favorable to the nonmoving party and draw all inferences and resolve all ambiguities in

that party's favor.  *LaSalle Bank Nat'l Ass'n v. Nomura Asset Capital Corp.*, 424 F.3d 195, 205

(2d Cir. 2005).

**Whether Cornerstone Realty Group, Inc.  is a proper plaintiff**

All defendants contend that the third cause of action, brought solely on behalf of

Cornerstone Realty Group, Inc., must be dismissed on the ground that it has no capacity to sue, no

-16-

standing, and no interest in the litigation.  Defendant Leviev LLC also argues that the first cause of action must be dismissed insofar as it is pleaded on behalf of Cornerstone Realty Group, Inc.  It is undisputed that on October 29, 2003 Cornerstone Realty Group, Inc. assigned all claims to Cornerstone Realty Group, LLC.  Defendants have, however, made no showing of any prejudice arising from this pleading error, and under the circumstances of this case, summary judgment on this ground is not warranted.

**First Cause of Action – Breach of Contract**

The basis of Cornerstone's breach of contract cause of action against Leviev LLC is straightforward: Leviev LLC did not build 20 homes by December 31, 2003; as a result, the APO/Cornerstone-DRA terminated; and therefore, according to Cornerstone, "Leviev breached its contract with Cornerstone and caused Cornerstone to lose its option to purchase 440+ lots."[3]

In moving for summary judgment, Leviev LLC contends that its admitted failure to complete 20 homes by December 31, 2003 was not a breach of the Cornerstone/Leviev Purchase Agreement.  Leviev LLC relies on the following provision in the Cornerstone/Leviev Purchase Agreement:

> LEVIEV shall acquire all lots for the construction and <u>use good faith and diligent efforts</u> to complete twenty (20) single family residences and convey same to third party purchasers on or before December 31, 2003.  LEVIEV acknowledges that Cornerstone Development's agreement with APO and the Development's rights agreement between APO and the County of Greene require 20 homes to be completed by December 31, 2002.

(Emphasis added.)  Leviev LLC asserts that it did proceed diligently and in good faith; that its

---

[3]
Although Cornerstone's amended complaint alleges other breaches by Leviev LLC (such as failure to obtain liability insurance), Cornerstone does not claim that any breach other than the failure to meet the 20-house deadline caused the termination of the APO/Cornerstone-DRA.

-17-

failure to meet the 20-home deadline was caused not by its failure to proceed diligently and in good faith but rather by conditions beyond its control and/or by the failure of others to perform; and that therefore it did not breach the contract.

In response, Cornerstone argues that, despite the "good faith and diligent efforts" language, the Cornerstone/Leviev Purchase Agreement required Leviev LLC to complete 20 houses by December 31, 2003, not merely to make good faith efforts to do so, and that therefore Leviev LLC's failure to build 20 homes by the deadline constituted a breach of contract as a matter of law. Cornerstone reasons that this 20-home requirement was imported into the Cornerstone/Leviev Purchase Agreement through its incorporation by reference of the County/APO-DRA and the APO/Cornerstone-DRA. The Court does not agree. The County/APO-DRA and the APO/Cornerstone-DRA did not impose an affirmative obligation to build 20 homes; rather, they simply provided that <u>if</u> 20 homes were not built by the deadline, the option to purchase lots would terminate. Thus, the incorporation of the terms of these agreements into the Cornerstone/Leviev Purchase Agreement did not give rise to an affirmative obligation on the part of Leviev LLC to build 20 homes by December 31, 2003. Leviev LLC's obligation regarding the 20 homes was the "good faith and diligent efforts" obligation set forth in the Cornerstone/Leviev Purchase Agreement.

The issue of whether Leviev LLC fulfilled its contractual duty to use good faith and diligent efforts to complete 20 homes by December 31, 2003 involves questions of fact that cannot be resolved on this motion. The Court concludes, however, that even if Cornerstone could prove at trial that Leviev LLC breached the Cornerstone/Leviev Purchase Agreement, Cornerstone is not entitled to recover the damages it seeks. Thus, summary judgment on this

-18-

cause of action is granted.

Cornerstone's claim for damages is based solely on lost future profits, that is, the difference between what Cornerstone would have paid for the 420+ lots and what it would have received for them from Leviev LLC.  In its Memorandum of Law and its Response to Defendants' Rule 7.1 Statement, Cornerstone acknowledges that it makes no claim for out-of-pocket expenses. The portions of Defendants' Rule 7.1 Statement pertaining to damages, and Cornerstone's responses thereto, are as follows.

> 146. Prior to the actual signing of the May 30, 2003 agreement, the $25,000 up front amount was paid by The Leviev Development, LLC to Cornerstone's attorney, Mr. Rizzo.
> Response: Admit but deny the materiality of this Statement.

> 147. These monies were to satisfy taxes on all the lots.
> Response: Admit but deny the materiality of this Statement.

> 148. Cornerstone was thus reimbursed for the taxes.
> Response: Admit but deny the materiality of this Statement.

> 149. These monies were considered by Cornerstone to be "good faith money".
> Response: Admit but deny the materiality of this Statement.

> 150. An additional amount of $5,000 was also paid to Cornerstone for expenses.
> Response: Admit but deny the materiality of this Statement.

> 151. Cornerstone was paid for the 20 lots at closing.
> Response: Admit but deny the materiality of this Statement.

> 152. Cornerstone received $268,000 ($200,000 for the 20 lots and $68,000 for taxes and expenses).
> Response: Admit but deny the materiality of this Statement.

> 153. Cornerstone did not pay for the lots but was "reimbursed", ostensibly by The Leviev Development, LLC.
> Response: Admit but deny the materiality of this Statement.

> 154. Cornerstone made a profit on the lots.

Response: Admit.

155. Cornerstone paid $375 per lot for the first 20 lots.
Response: Admit.

156. Cornerstone received $10,000 for each lot.
Response: Admit that Cornerstone was compensated for the lots.

157. Cornerstone is unable to provide what it derived as its profit.
Response: Admit but as set forth below, deny the materiality of this fact.

158. Cornerstone does not possess documents that reflect people hired to do
preliminary work and cannot recall how or what they were paid.
Response: Admit but as set forth deny the materiality of this fact.

159. Cornerstone cannot state how much it spent on advertising.
Response: Admit but as set forth below, deny the materiality of this fact.

160. There was no advertising by Cornerstone before the contract.
Response: Admit but deny the materiality of this fact, since it did not own any
lots prior to the contract with Leviev.

161. Cornerstone is unable to state total amount of money spent on people
hired to do preliminary work, office space and advertising.
Response: Admit but as set forth below deny the materiality of this fact.

162. Cornerstone does not have documents showing receipts, bills or invoices
to that effect.
Response: Admit but as set forth below, deny the materiality of this fact.

163. Cornerstone states it kept records of expenses and provided same to its
accountant but would or could not produce those records.
Response: Admit but as set forth in Plaintiffs' Counter-Statement, below, deny
the materiality of this fact.

164. Cornerstone stated it "didn't do a lot of the stuff because [it] didn't have
the lots."
Response: Admit but as set forth below, deny the materiality of this fact.

165. Cornerstone acknowledged that all costs for signage, marketing and
decoration were paid by The Leviev Development, LLC.
Response: Admit but as set forth below deny the materiality of this fact.

166. Cornerstone could not state how much it was out-of-pocket since 2001

-2002.
Response: Response: Admit but as set forth below, deny the materiality of this fact.

167. Cornerstone had no economic feasibility plan to determine profit to be derived and could not state forecasted profit.
Response: Admit but deny the materiality of this fact. Baum projected a profit if all lots that were subject to Cornerstone's option were developed in the amount of $11,475.00 ($25,000 per lot). He admitted in his deposition in this action that the profit could range between $10,000,000 and $30,000,000. His plan was after the first twenty homes including three models were built to purchase the remaining 440 lots on which Cornerstone had an option within one year of the Leviev agreement with Cornerstone. Leviev projected a profit of $40,000, 50,000 or 60,000 per home. At the time of his deposition he was offering the properties for sale and would agree to sell them for $5,000,000. In addition, based upon Cornerstone's contract with Leviev Jacobs calculates his damages at a minimum of $6,554,000. This calculation is based upon the agreed upon sales price of all of the remaining 420+ lots, which [would] have been sold to Leviev had the breach not occurred, less the cost of acquisition of those lots from the APO.

(Citations to record omitted.)  The section of Cornerstone's Counterstatement Pursuant to Local Rule 7.1 pertaining to damages states in full:

239. Leviev would sell the lots today for $5,000,000. See Paragraph 167 supra and response.

240. Baum projected the profit on the project as planned variously between $10,000,000 and $30,000,000; he projected the profit on each lot as $25,000 for a total profit of at least $11,000,000. Paragraph 167 supra and response.

241. Leviev thought he could derive a profit of from $40,000- $60,000 per house. Paragraph 167 supra and response.

242. Pursuant to the various agreements at issue in this case, Roy Jacobs calculates his damages as $6,554,000. Paragraph 167 supra and response.

The law regarding loss of future profits as the measure of damages in contract cases is well established in New York.  As explained by New York's high court:

Loss of future profits as damages for breach of contract have been permitted in New York under long-established and precise rules of law. First, it must be

-21-

demonstrated with certainty that such damages have been caused by the breach and, second, the alleged loss must be capable of proof with reasonable certainty. In other words, the damages may not be merely speculative, possible or imaginary, but must be reasonably certain and directly traceable to the breach, not remote or the result of other intervening causes. In addition, there must be a showing that the particular damages were fairly within the contemplation of the parties to the contract at the time it was made. If it is a new business seeking to recover for loss of future profits, a stricter standard is imposed for the obvious reason that there does not exist a reasonable basis of experience upon which to estimate lost profits with the requisite degree of reasonable certainty.

*Kenford Co., Inc. v. Erie County*, 67 N.Y.2d 257, 261 (1986) (citations omitted).  Although lost profits need not be proven with mathematical precision, they must be "capable of measurement based upon known reliable factors without undue speculation."  *Ashland Mgt. Inc. v. Janien*, 82 N.Y.2d 395, 403 (1993).  Projections of future profits based upon "a multitude of assumptions" that require "speculation and conjecture" do not provide the requisite certainty.  *Kenford*, 67 N.Y.2d at 262.

Under *Kenford*, Cornerstone may not recover future lost profits.  Even accepting that Leviev LLC breached the Cornerstone/Leviev Purchase Agreement, Cornerstone cannot demonstrate that Leviev LLC's breach caused Cornerstone's alleged loss.  Cornerstone bases its claim on the assumption that, if there had been no breach, Leviev LLC would have purchased hundreds of lots in addition to the first 20, resulting in millions of dollars of profit to Cornerstone. But the Cornerstone/Leviev Purchase Agreement merely gave Leviev LLC the <u>option</u> to purchase the additional lots.  Leviev LLC was not obligated to purchase any lots beyond the initial 20. Cornerstone cannot reasonably be permitted to recover damages based on the theory that it would have made a profit if Leviev LLC had exercised options it was not contractually required to exercise.

In any event, even assuming that the APO/Cornerstone-DRA had been extended and Leviev LLC had wished to purchase more lots, the alleged loss is not capable of proof without undue speculation.  There is no reliable basis to estimate the number of lots Leviev LLC would ultimately have purchased under the contract.  There is no evidence regarding the likelihood of success of Leviev LLC's development efforts at Sleepy Hollow; certainly, there is no basis for Cornerstone's assumption that Leviev LLC would have exercised its option under the Cornerstone/Leviev Purchase Agreement to purchase hundreds of lots.[4]

Finally, Cornerstone makes no showing that the damages it seeks were fairly within the contemplation of the parties to the contract at the time it was made.  It is clear from the record that, during the months leading up to the Cornerstone/Leviev Purchase Agreement, the people involved in the project, including Jacobs, recognized that time was "growing short" to complete 20 houses.  Indeed, as noted, the agreement did not require Leviev LLC to complete 20 homes but rather to make good faith and diligent efforts to do so.  Also, there were discussions about obtaining an extension of time to build the homes, and the Cornerstone/Leviev Purchase

---

[4]

The fact that Leviev LLC later contracted directly with the County to purchase the County-owned lots for $1.5 million in 2005 does not support a finding that Leviev LLC would have purchased hundreds of lots under the Cornerstone/Leviev Purchase Agreement.  First, the purchase price of $1.5 million was far less than the $7 million Leviev LLC would have paid under the Cornerstone/Leviev Purchase Agreement.  Also, the terms of the purchase agreement with the County differed substantially from the complexities of the contractual arrangements involving the County, APO, Cornerstone, and Leviev LLC.  For example, the Cornerstone/Leviev Purchase Agreement prohibited Leviev LLC from maintaining an inventory of more than 15 lots "not under contract" to a third-party purchaser; thus, Leviev LLC's ability to purchase lots depended upon its ability to attract a sufficient number of third-party purchasers.  Nor is it clear how many lots would ultimately have been available to Leviev LLC under the Cornerstone/Leviev Purchase Agreement.  For example, Cornerstone itself had the right to withdraw from Leviev LLC's option ten lots during the first year and six during the following years; the County/APO-DRA contemplated that an unspecified number of the lots would be deemed "unbuildable" or designated "forever green"; and the County and APO had the right to terminate the County/APO-DRA at any time by mutual consent, thus automatically terminating the entire scheme.

Agreement required Cornerstone to seek an extension of the deadline from APO and the County. Further, the agreement included a reasonable remedy for Leviev LLC's failure to meet the 20-house requirement: loss of its option rights and forfeiture of the payments it had already made.[5] Particularly in view of the uncertainties inherent in the venture, no reasonable factfinder could conclude that, in addition to the loss of its option and payments, the parties contemplated that Leviev LLC would be exposed to liability for $6 million in damages.

The Court concludes that, even if Cornerstone could prove at trial that Leviev LLC breached the Cornerstone/Leviev Purchase Agreement, under *Kenford*, Cornerstone is not entitled to recover the damages it seeks.  Accordingly, summary judgment is granted dismissing the first cause of action.

**Third Cause of Action - Fraud/Fraudulent Scheme**

In the third cause of action against all three defendants, Cornerstone alleges that on various occasions prior to entering the Cornerstone/Leviev Purchase Agreement, defendants represented to Cornerstone that the Leviev defendants were experienced developers who intended to develop Sleepy Hollow in accordance with the APO/Cornerstone-DRA and had the financial resources to do so, and further that when they made the representations, defendants had the preconceived and undisclosed intention not to build 20 homes but to allow the APO/Cornerstone-DRA to expire so that Leviev LLC could take Cornerstone's place as developer of Sleepy Hollow.  Cornerstone further alleges that, after entering into the Cornerstone/Leviev Purchase Agreement, Leviev LLC purposefully breached it, resulting in termination of the

---

[5]
It is undisputed that Leviev LLC paid Cornerstone $68,000 in expenses as well as $10,000 per lot for the first 20 lots, giving Cornerstone a $192,500 profit on the lots ($9,625 per lot).

APO/Cornerstone-DRA and Leviev LLC's replacement of Cornerstone as developer of Sleepy Hollow.

Defendants contend that these allegations amount to no more than a claim that defendants fraudulently concealed an intention to breach the contract, and thus do not state a fraud cause of action distinct from the contract claim.  Under New York law, "the failure to disclose an intention to breach is not actionable as a fraudulent concealment."  *TVT Records v. The Island Defendant Jam Music Group*, 412 F.3d 82, 90 (2d Cir. 2005); *accord Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.* 98 F.3d 13, 19 (2d Cir. 1996) ("[I]ntentionally-false statements by [defendant] indicating his intent to perform under the contract ... [are] not sufficient to support a claim of fraud under New York law.").

Cornerstone argues that it has stated a claim for fraud distinct from the breach of contract claim.  In New York, a cause of action for fraud may be based on allegations that the defendant induced the plaintiff to enter a contract by making a misrepresentation of present fact, not of future intent, that was collateral to or extraneous to the contract.  *See TVT Records*, 412 F.3d at 91 (citing *Deerfield Comms. Corp. v. Chesebrough-Ponds, Inc.*, 68 N.Y.2d 954, 956 (1986)).  It is doubtful that defendants' alleged misrepresentations that Leviev LLC had the ability and intention to perform the contract constitute misrepresentations of present fact collateral to the contract such as would support a fraud claim.  In any event, even assuming that Cornerstone can make out a fraud cause of action, it cannot recover the damages it seeks.

The rule in New York State is that "all elements of profit are excluded from a computation of damages in an action grounded in fraud."  *AFA Protective Sys., Inc. v. American Telephone & Telegraph Co*, 57 N.Y.2d 912, 914 (1982) (citing *Reno v. Bull*, 226 N.Y. 546 (1919)).  New

York's Court of Appeals summarizes the law in New York on damages for fraud as follows:

> The true measure of damage [in a cause of action for fraud] is indemnity for the actual pecuniary loss sustained as the direct result of the wrong or what is known as the out-of-pocket rule. Under this rule, the loss is computed by ascertaining the difference between the value of the bargain which a plaintiff was induced by fraud to make and the amount or value of the consideration exacted as the price of the bargain. Damages are to be calculated to compensate plaintiffs for what they lost because of the fraud, not to compensate them for what they might have gained. Under the out-of-pocket rule, there can be no recovery of profits which would have been realized in the absence of fraud.

*Lama Holding Co. v. Smith Barney, Inc.*, 88 N.Y.2d 413, 421 (1996) (citations and quotation marks omitted).

Cornerstone claims no out-of-pocket loss. To the contrary, it is undisputed that Leviev LLC paid Cornerstone all sums due for the 20 lots Leviev LLC was obligated to purchase, and reimbursed Cornerstone for attorney's fees and other expenses under the contract. Cornerstone seeks only to recover compensation for "what [it] might have gained," *id.*, based on the highly speculative assumption that if Cornerstone had contracted with another developer instead of Leviev LLC, the developer would have met the 20-home deadline and then purchased hundreds of additional lots.

In its Memorandum of Law in opposition to Baum's summary judgment motion, Cornerstone argues that it is entitled to seek damages "based on lost economic opportunity in this action given that Plaintiff claims to have foregone the opportunity of pursuing other developers[.]" It is true that in some cases a fraud plaintiff has been permitted to pursue a claim for compensation for foregone economic opportunities. *See, e.g., Stewart v. Jackson & Nash*, 976 F.2d 86, 88 (2d Cir. 1992); *Virola v. XO Comms., Inc.*, 2008 WL 1766601, *16 (E.D.N.Y. April 15, 2008); *Doelha v. Wathne Ltd., Inc.*, 2000 WL 987280, *7 (S.D.N.Y. July 17, 2000). Here,

however, it would be impossible to calculate the economic benefits, if any, Cornerstone might have gained if it had contracted with a different developer instead of defendants. An award of damages for lost economic opportunity would of necessity be based on nothing more than speculation and conjecture. Accordingly, defendants are awarded summary judgment on the third cause of action.

### CONCLUSION

In view of the above rulings, the Court does not reach the other issues raised herein. The motions for summary judgment are granted, and the cross claims and counter claims are dismissed. It is therefore

ORDERED that the motion for summary judgment by Fred Baum (Dkt. No. 65) is granted; and it is further

ORDERED that the motion for summary judgment by defendants Konstantin Leviev and The Leviev Development, LLC (Dkt. No. 69) is granted; and it is further

ORDERED that the action is dismissed in its entirety.

IT IS SO ORDERED.

Dated: September 28, 2010
        Syracuse, New York

Norman A. Mordue
Chief United States District Court Judge

-27-